May it please the court, my name is Phil Brennan and I'm here representing the defendant below, Kevin Williams. I will try and reserve five minutes of my rebuttal time. What I would first like to do is offer a condensed version of the facts that are relevant for the arguments I want to present this morning, and then I would like to address three issues. The first issue pertains to wire fraud, which counts one through three of the superseding indictment, and whether the government failed to offer sufficient proof on two elements in particular, that is materiality and showing that the mail emails were used to further an essential step in the overall scheme. The second issue I will address is the extortion count, which is count four of the superseding indictment, and whether the court erred in instructing the jury, and also whether the government failed to offer sufficient proof on both the objective and subjective analysis that is required in a true threat case. And finally, I will address the sentencing guideline issue, and particularly the grouping issue. Turning to the facts of the case in a very condensed version, we start in the summer of 2007, when Mr. Williams, who is a resident of Washington, develops an interest in a federal criminal case that is taking place in Atlanta, Georgia. He contacts two individuals that are associated with the case, FBI agent Cromer and attorney Kaufman, who is the attorney representing the investors in the investors committee that had suffered harm in that case. These phone calls carry a similar theme that we're going to hear in the emails that we'll be following. Essentially, Mr. Williams is saying that he has developed an interest in the Atlanta case, he's an investigator, he has uncovered information, namely where the money is missing, and he'd like to share it, but he wants to be paid for it. Agent Cromer's reaction is very similar to what attorney Kaufman's reaction is, which is, with regard to agent Cromer, you need to tell me what you've got before I even consider paying you, and that infuriates Mr. Williams. And secondly, Mr. Kaufman says, you need to apply through the normal court procedures in order to be paid, and I personally am not going to be paying you. So these phone calls take place, and we fast forward to a couple months later, which is in October of 2007, and that's when the mailbox bomb goes off on Mr. Williams' Washington property. And the jury found that Mr. Williams is the one that was responsible for that mailbox bomb. We fast forward again a couple more months, this time into January and February of 2008, when there are three emails that are the subject of Counts 1 through 3, and also Count 4, which is extortion. These emails are sent on January 24th, and then February 9th, and then February 18th. But actually, before this email, Mr. Williams emails one of the members of the committee, Mr. Atwater, the former football player. And again, in that email, it's very similar to what we heard on the phone conversations. He's got information, he wants to be paid for it, and he wants to help. Mr. Atwater forwards that email on to various individuals, and there's no response. Two days later, Mr. Williams sends the first of the three emails which are at issue on this case, Count 1. That's the January 24th email. And two weeks later, he sends that, by the way, to about seven or eight individuals, members of the Investors Committee, as well as Attorney Kaufman and his associate. A couple weeks later, he sends another email, which is the subject of Count 2. That's to Mr. O'Neill, also a recipient of that first email to the group, but to him individually because they've been communicating. And then finally, two weeks later, in the middle of February, he sends the third email, which is the subject of Count 3, as well as the extortion count, Count 4. To summarize these emails, Mr. Williams is saying that he's got valuable information, he wants to be paid for it, he thinks that the people that are working on this case that are being paid lots of money aren't doing a very good job, and that he can do a better job. He also says that he's suffered hardship, whether he's had his phones tapped or his computer hacked or incurred all these expenses on his own. So essentially, these are unsolicited emails that he's sending. They're repetitive. They are grammatically and spelling-wise not very well written. There's no support for what he's saying, other than he's got information, but he's not saying what that information is. And they could be characterized as bizarre in terms of the phone tapping and the expenses. Well, you know, I appreciate your summary of the evidence, but it was a jury trial, correct? Correct, Your Honor. So when you're claiming, you know, instructional error, insufficiency of the evidence, we do have to give, you know, I mean, the arguments can't be the same to us as they were to the jury. So some of these, anything that the jury had to resolve, they resolved against your client. So I guess it would be more helpful to just, you know, point out more where if you're claiming, you know, in mind of the, if you're claiming insufficiency of the evidence, the standard of review. Okay. Well, let me jump to that then. The reason I was pointing out these facts is because even when construing the evidence in favor of the government, which clearly must happen in this case, there's missing elements. There's missing in terms of with regard to the wire fraud counts, we're missing materiality and we're missing the essential nature of the email. So let me. I just meant, when you say missing, you're talking about sufficiency of the evidence. Correct, Your Honor. Go ahead. So let me jump to wire fraud, which there are, even when construing all those facts in favor of the government, the government failed to prove materiality and, as more fully developed in my reply brief, failed to show that the emails were an essential part in the overall scheme. And you're saying he made no material representations in the emails. Correct, Your Honor. And you're giving all inferences. That's correct, Your Honor. Okay. And the reason I. I'm sure that your able appellee's counsel will probably want to respond to that, so maybe you can frame that for that. Certainly. The materiality question asks whether a reasonable person would be influenced to part with money. That's essentially what the jury instruction said. And in this case, I would submit that a reasonable person would not be persuaded to part with money or to consider hiring Mr. Williams for multiple reasons. First of all, if you just look at the content of these emails, they are coming from a complete stranger who is asking to be paid a variety of sums. Sometimes it's $172,000. Sometimes it's $250,000. Sometimes it's referenced to $100,000 in expenses. And I think the reasonable person looks at that and considers it's not material to what they are doing. For instance, the attorneys, Attorney Kaufman, told us in his testimony that he's been an attorney for 35 years. And what is it that's material in these essential spam messages? He's already had contact with this individual, and he rejected them outright in the phone calls that preceded these emails by five or six months. So there's nothing in these emails that's material to him. And he said in his trial testimony he simply wished that Mr. Williams would just go away. And even if we remove Mr. Kaufman from the mix, the investors also, you look at what Mr. Williams is offering, and it's really nothing. He's pitching essentially a job resume to individuals that are highly skeptical. If we look at the testimony of Mr. O'Neill, he's the one that had the most contact with Mr. Williams. But even Mr. O'Neill showed how sophisticated he was. In the interactions between Mr. Williams and Mr. O'Neill, Mr. O'Neill repeatedly said, you know, I'll consider whatever you're offering, much like any prospective employer, but you need to show me what you've got. And he never did. So there was nothing. But you're, I think in your briefs, aren't you, you're saying we should review this sufficiency of the evidence challenge de novo because your sentencing memorandum raised the same arguments you now raise on appeal, something like that, even though you didn't file a motion for acquittal on those grounds? So I'm not finding precedent for taking that approach. Well, my argument is twofold. First of all, I was not the attorney below, so the court is correct that the motions were not made with regard to counts one through four. My argument is, you know, the whole purpose of making a motion in front of the trial court is to let the trial court consider the issue and then accept or reject it. And all of these arguments I make in my sentencing memo, and they didn't persuade the trial court. So that's one aspect of it. The second aspect of it is, I guess I'm latching on to the fact that this is speech at the end of the day, and I think a higher burden would be appropriate, certainly with regard to count four, which is the extortion, but with regard to this also, because these are e-mails being transmitted over the Internet and nothing more. So I would ask for a higher burden. I guess, though, if you – I know your client contends that none of these material – none of these false statements were material, but I'm just wondering, why couldn't a rational trier of fact find beyond a reasonable doubt that Williams' falsehoods were material in that a reasonable person would attach importance to especially in the early months of his scheme before his tone and demeanor went south. Williams also promised he had information related to the location of the missing IMA funds. The statement was made solely to induce reliance by the Investors Committee, which had been unable to locate those funds by other means. So I'm just wondering why couldn't they have – why couldn't they have found those things? Well, if they consider the facts and circumstances of the case, they actually listen to the people. They realize that Mr. Williams' interactions with these people fell on deaf ears. So Mr. Kaufman's a perfect example. He wanted to – he actually started passing them off to his associate before he even received these e-mails. But the fact that he wasn't successful are things that you argue to the jury why they're not material. But we have to – we've got to look through a different lens. And so that's what – I'm feeling like I'm hearing a jury argument here. Well, if I was a recipient of these e-mails, I think most of us would look at them the same way, which is, okay, you're claiming to be a great investigator. The follow-up is, show me what you've got. Prove it to me. And this is why this case is so unique, because all the cases I cite in my brief have instances where people were actually fooled and actually fell for the duping. I realize that it doesn't need to be successful to be actionable. But I think the court does have to take into consideration this incredibly unique fact pattern, which seven or eight people receiving these e-mails, none of them took the bait that Mr. Williams was offering. And that actually moves me to, I think, what is my stronger argument, which is the essential nature of these e-mails. The question is, were these e-mails used to carry out an essential function of the scheme? And in Schmuck and Garlick, we look at examples where, for example, in Schmuck, that's the odometer case, where there's a title application actually being transmitted and is necessary to finalize the deal. In Garlick, this court held that there was sufficient connection to the wires because there was both an offer and acceptance. One conviction was the offer. The second one was the acceptance. And we all know from contract law, that's critical. But in this case, you have to ask, for each of these e-mails, what was so pivotal about these e-mails? They were essentially repeats of one another. So if count one was, let's say, essential, what was essential about count two and count three, which are essential repeats? Moreover, they were unwanted, and they were not, at the end of the day, something that latched onto any actual fraud that took place. I realize that you probably, our interests may not be exactly the same, but there was one before that there's an area that I wanted to ask you about, is the grouping on the sentencing. Yes, Your Honor. And apparently the district court looked at it, this was all one big conspiracy, as opposed to breaking it down to who were the victims. And so your argument is that the district court grouped it wrong. And thereafter, if, hypothetically, if we were to agree with that, is it possible that your client could get more time when he goes back? I think that the grouping would result in less time. I guess it is possible. But I guess from the standpoint, you know, appeals aren't supposed to be treated punitively. But when you raise the issue, and if there were a legal error on the grouping, and it goes back, and the enhancements are attached in a different way, it would seem to me that that's a potential that your client faces. It is. I think Your Honor is correct. It is a potential. But as I've run the numbers, I think they actually are lower if the grouping is done correctly. For example. But it could get higher? I guess anything is, you know, we as defense attorneys always seem to find stuff in the PSRs that neither the prosecutor nor the defense attorney. Well, I'm just taking it under be careful what you ask for sometimes. That's what. I understand that. And, you know, for example, one issue I have with the grouping is that the court is adding five points for guns. And I think that if my grouping argument is correct, that five points for the guns doesn't make any sense. And actually, even if I'm wrong on this, I don't think the gun argument makes sense. Because there's no indication that Mr. Williams was possessing any firearms at the time that he transmitted his e-mails. And I raise the issue in the district court, which precisely, which is the gun we're talking about, the firearm? Is it the mailbox firearm? Well, that vaporized two months before these e-mails were even sent. Is it the zip guns? Can't be that because they were seized by the police at the time in October of the mailbox bombing. Is it some other guns? Well, he was homeless at the time he sent these e-mails. So we don't know about that. Well, tell me your best argument on the grouping because I have to say that on one level, that it appears that he blew up his mailbox, you know, because he wanted to, you know, he wanted to have straight creds. He wanted to act like he was, hey, I'm being targeted, you know, if you follow that in terms of you take that inference. So in that sense, it does seem like it's, you know, part of one big conspiracy. It doesn't seem to be unrelated. But so what's the best, you know, why can't, why isn't the district court right on that? Well, I look at the different subdivisions of 3D1.2 and they talk about victim and they talk about transactions. So let's first talk about the victim. In this case, we have victims in Atlanta and counts one through four logically pertain to those victims. They're the victims of the e-mails. They received them. They took the extortionate threat, what have you. But how are they victimized by something that happened two months before they even received these e-mails? There's a different set of victims. I think the victims for the mailbox and the guns are, in fact, society at large. Secondly, with regard to the transaction, I think there's a big gap here in terms of transaction. There's two and a half, three and a half months, what have you. And I think they're different transactions. You know, how were the Atlanta victims somehow even aware of the zip gun, let alone victimized by it? Ditto for the false statements. I mean, what they knew with regard to the mailbox bomb was fairly limited, a sentence here and there. So I think both the term, if you look at the victim and the- So are you taking basically the language of the sentencing guidelines say that it has to go by victim, not by- No, but I'm looking at just the language when it talks about, I think it generally, you typically see these situations in grouping where the victim is clearly the same person. And in this case, I don't think we see that. Do you want to reserve? I would like to reserve. Okay. I'd like to talk a little bit about extortion, but I'll do that in my rebuttal. Thank you. Okay. Thank you. Good morning. Good morning, Your Honors. May it please the Court, on behalf of the appellee, Arvind Swamy, of the United States government. Your Honor, this is a case where the defendant concocted a fraud scheme in order to deceive a series of victims. But what's crucial to that fraud scheme was that he planted a fake or planted a real bomb in his mailbox to, as Your Honor suggested, give him some type of credibility, to make it appear as if his information was so good, so valuable, that someone would try to hurt him for it or hurt him to prevent him from disclosing it. And when you get to the question of materiality, Your Honor, as it relates to the wire fraud counts, here are the things to consider. First, think about the nature of the actual scheme that he was trying to work, which was he was trying to defraud investors who had already been defrauded, and he's attacking them at their most salient weakness. These are people who have been defrauded out of millions and millions of dollars, and ultimately they want to know, where did my money go? And he tells them, he leads them on this chase to believe that there is some pot of gold out there and he's found it. That is crucial because that goes to the hearts and the minds of these victims. And a reasonable person in this case, the jury, thought that those were material. The second thing is the mailbox bomb. I mean, one has to consider, why plant a bomb in your own mailbox, risk destroying your property as well as maybe hurting yourself, if you don't think it's important to execute your scheme. Remember what happened. When he first approaches Agent Cromer in the early part of, I think, August or September of 2007, he's sort of rebuffed. That's why he plants the mailbox bomb. He realizes he's got to do something to give himself credibility in the eyes of his victims. Who are you arguing? Are you arguing the grouping? No, Your Honor. Well, this goes to both. I think, ultimately, you're right, but I'm talking about just the materiality issue. And what I'm saying is... Well, what does the bombing have to do with materiality? Well, that's one of the misrepresentations he makes throughout the e-mails. In each one of the e-mails as well as throughout the scheme, he tells people that somebody is trying to kill me, somebody is trying to hurt me, somebody has planted a bomb in my mailbox to prevent me from providing you this valuable information. And it's material because he thinks it makes his story more believable? Absolutely, Your Honor. And there was not only is that just an inference from the fact that he's done it, but that's, in fact, what he told the ATF agent and the postal inspector when he was interviewed, that he didn't think that this was somebody in the neighborhood, he didn't think it was a bunch of hoodlums. He indicates in his statements to them at the time that they're investigating the bomb that he thinks that this bomb was planted by somebody who's trying to prevent him from disclosing his information. So that's why it's material, Your Honor. I'm not... Just speaking for myself, I'm not so concerned about the materiality, but on the sentencing, on the grouping, it makes perfect sense to me that this is all a big conspiracy. But when I look at the guidelines, Section 3D1.2b, it says it must be a part of a common scheme or plan and involve the same victim. And so I'm seeing that the language of the guideline seems to be an impediment for you in this situation. Well, let's break it down one by one. I don't think there's a whole lot of debate that it's the same common scheme or common criminal conduct because the bomb was integral to the fact... I'm going on and involved the same victim. Right. Because AMS is there, right? Correct. Absolutely. And same victim, not same victim, exactly. Right. Well, what I think you have to look at is the conduct that underlies the bomb and the false statements. Those actions were part and parcel of the fraud scheme. They were done. He lied to agents here. He planted a bomb in his mailbox in order to defraud the victims. Do we have any cases that help us on this? Because it seems like our case in U.S. v. Booze, it wasn't cited in the briefs, but it seems that case doesn't help you. It seems that you would have to distinguish that case. And candidly, I'm not familiar with Booze because it's not cited in our briefs. But let me suggest one thing before we get there and suggest two things. One is this is not a neological result, and I know this is not what was argued below, but if you look at the guidelines, look at Section 3D1.2c, and that guideline actually says that in situations where the offense conduct that you're looking to determine whether it should be in the same group or not, when it could have been a specific offense characteristic for the other side of the group, for the fraud crimes, which all of these could have been. The bomb could have been a specific offense conduct that would have adjusted the guidelines for the fraud conviction, the false statements in terms of obstruction, then you group them all as one thing. So it's not a neological result in this situation because that's essentially what the guidelines contemplate. It contemplates that where you have a series of actions, all which go to the heart of one specific crime, one set of crimes in this case, that affected the same victims, you have conduct that all should be grouped. Well, okay, from your perspective in terms of the time that the defendant faces, what is the advantage to you to have a court look at it as a conspiracy as opposed to grouping them as two separate victims? And I asked appellant's counsel whether he could face more time. And I did just yesterday or the day before a back-of-the-envelope calculation, and I think Mr. Brennan is right. I think if it's not grouped, then we end up with sentencing guidelines that are going to be lower than ultimately what the court found these guidelines were. And that's because I think Mr. Brennan is right. The grouping doesn't apply. There's a question as to whether the leadership enhancement should apply because the leadership was to the obstruction, and so it shouldn't apply to the fraud count. That would change things. I also think that he may not get the same kinds of enhancements. So I think that Mr. Brennan is probably right. It ultimately may be to the defendant's benefit to not group them. But I think the grouping, consider the grouping from another perspective. If we hadn't charged this conduct, if the defendant hadn't been charged with bombing his own mailbox, if he had not been charged with making a false statement, then it all would have come in under relevant conduct on the fraud guidelines anyway. And then we're adding those adjustments the way they would be in any event. It would come in as relevant conduct because it's part of the same scheme. Is that right? Right, Your Honor. Under Section 1B1.3, it would come in under relevant conduct. And so we shouldn't be in a situation here because the government proved these acts beyond a reasonable doubt, higher standard than you would be required to as opposed to if it was just relevant conduct. We should be in a situation where the defendant gets a benefit from that, that just because we proved the facts of these crimes beyond a reasonable doubt, that he should now get a benefit and not be able to group them. That's why the grouping makes sense. That's why the involved victims, it doesn't say as a statutory matter these are statutory victims under the Mandatory Victim Restitution Act. But when you say it makes sense, I mean, can you point to a guideline provision that authorizes that? Well, again, Your Honor, I think Section 3D1.2C would have the same effect as the way the Court applied 3D1.2B. And that section, Your Honor, 3D1.2C reads, when one of the counts embodies conduct that is treated as a specific offense characteristic in or other adjustment to the guideline applicable to another of the counts, all of that should be grouped as one count. And so if you start with the fraud conduct and you look at, well, the bomb would have been a specific offense adjustment, possession of a destructive device, then you would add that into the fraud guideline. If you look at the obstruction, you would add the obstruction because that's an adjustment to a fraud conviction. You could add that under 3C1.1. 3C1.1, you would add that as well. So all of these adjustments would apply to the fraud guidelines if the Court had applied 3D1.1. Essentially what Booz says is it's a kiddie porn case. And it essentially says that the primary victim of the defendant's distributions was not the, I think the U.S. Attorney's Office was arguing it was society at large. And it said, but rather it was the young girls depicted in each of the photographs that the defendant distributed. So I guess yours isn't exactly the same. But, I mean, you're still, but, I mean, the obvious victim of the bombing was, you know, I guess the person who owns the mailbox. But what you're saying is really the other people were victims of this because why? Because the whole purpose of planning the bomb was to defraud the investors in Atlanta. That was the entire purpose. This was not something that he did just because he wanted to see his mailbox explode, just because he wanted to hurt somebody who might be dropping the mail off. So is every, all of those victims, were they all relying on the fact that he blew up his mailbox? Well, I think so, Your Honor. I think that that's what the jury found. Each one of the three emails that's charging counts one through three. Each of them makes an explicit statement that my mailbox was bombed to prevent me from disclosing this information to you. And so in each of those, I think that there was sufficient evidence that that was, I mean, again, we're not, the defense is not challenging. But when you say each of those victims, you're not talking about the fraud people. You're talking about, is it? No, I am talking about the fraud victims because the fraud victims, so the fraud victims received the emails. In each one of those emails, there's a statement, my mailbox was bombed to keep me from giving you information. So the conduct of bombing the mailbox was part and parcel of getting the victims in the fraud scheme, those people in Atlanta, to believe him, to believe that his information is valuable. So that conduct was, he did those things to victimize those people, to make his fraud scheme more powerful, to make it seem like I really need to get this information if somebody else is trying to kill you for it. But the way he wants to victimize them is he wants to get money from them. Right. But he, but again, his initial attempts to do that are sort of rebuffed. And so he says, I need to make it, I need to make my fraud even more powerful. I need to make my lies more powerful. I need to convince people that what I have is worth paying for. And in fact, he had nothing. In fact, he invested nothing in getting the nonexistent information. So what he is doing is he's using that bomb to make his threats, his fraud scheme more credible. And in that way, that underlying conduct, what he did in bombing his own mailbox and then lying about it to the officers, was designed to augment his fraud. And in that way, it affects the same victims. And the guidelines says it has to involve the same victims. It absolutely, positively does. That bombing, because it's part and parcel of the fraud, in this unique set of facts, and I admit this is a unique set of facts, but in this unique set of facts, the bomb was integral. It was material to the fraud scheme because that's what he lied about. And remember, defense is not arguing or not contesting that he didn't blow up his own mailbox or lie to the agents about it. No one's questioning that. He admits that he did those things and we're not here on appeal arguing as to whether or not that's true. So that was an… This goes, though, where no case is ever quite gone, right? This probably goes where no case is ever quite gone. I mean, this is, Your Honor, you're absolutely right, one of the most unique set of facts I've ever seen. And it's peculiar. But that doesn't mean that the application of these guidelines and grouping the way that the district court did it is wrong. There's nothing to suggest. I mean, the district court made the appropriate findings and looked at the guidelines and said this is the same scheme. It involves the same victims. I think that this is the way to apply the guidelines. And I think the district court… One of the peculiar things about this case is we keep talking, as you just did, about the victims. As a matter of fact, there were no victims. All there were were potential victims that were trying to get to do something, but they were not victims. I guess that's true in a sense, Your Honor. I mean, nobody ultimately did part with any money. I would, as a sort of existential philosophical question, ask whether when someone lies to you and extorts money out of you and threatens you, whether you're the victim or not. I mean, if you take the fraud aside for a second and just look at the email extortionate context, those people who received the threat, they were, in fact, victimized. Once you receive that threat, you are a victim of somebody trying to cause fear. And so to the extent that they're not a victim of the fraud, I mean, I think that there's a part of that that's true, but they're absolutely positively a victim of the extortion because in that situation they were threatened, which if the court would permit, I want to just address the 875, that extortion count issue. I know defense counsel didn't get to it. But the question in that case is whether the jury instructions were sufficient. And what I think really defense counsel is challenging is that there's no objective standard in there somewhere. And I think the jury instructions were legally sufficient in this case. And here's why. There's no question that they instructed on subjective intent, that the defendant had to have an intent to cause fear.  That the jury had to find that the communication, the language, the statements were threats. And if they applied a plain definition meaning of the word threat, they would have, the instructions were sufficient. Because the plain definition of the word threat is language that communicates fear, that causes people to be afraid of bodily harm. And that's exactly what the objective standard that the defense is complaining about is not in the jury instructions. Essentially what they're saying is because the court didn't define a term that means what it means in plain common English, the jury instructions are somehow erroneous and then plainly erroneous. And that was because it didn't define true threat? It didn't define the word threat. True threat is defined in the jury instructions. It's very clearly defined as a threat that the defendant has to intend to be perceived as a threat. But it didn't just say, it didn't say a true threat is a statement that the defendant has to intend to cause a threat. It didn't say it's speech that the defendant has to cause fear. It said a threat. And if the jury looked at it and said, well, we have to conclude that this is a threat, that's in the jury instructions. So in other words, the jury could not have concluded that the defendant was guilty on count four if it didn't first conclude that the language caused fear, that the language caused someone to believe that there was the risk of bodily harm. And so for that reason, the jury instruction is more than legally sufficient. If you assume for a moment in a hypothetical, Your Honors, that there was no subjective intent requirement, so let's just assume our law is pre-Virginia v. Black, and there's no subjective intent requirement, nobody would be complaining that this jury instruction was incorrect. It's only now because they have this word subjective intent that we're hearing this argument that somehow we need to provide the flip side of the coin, this objective intent. Well, so does Bagdasarian, I guess, does that help you or hurt you? I think Bagdasarian merely says, well, first, Bagdasarian is a sufficiency of the evidence case. It's not a jury instruction case. In Bagdasarian, although it's not anywhere in the opinion, you go look, that was a bench trial in front of a district court judge in the Southern District of California. In that situation, they defined what objective threat was, and the judge relied on that. So in that situation, there was no question what objective threat was or what it meant to be a threat from the objective perspective. So I think Bagdasarian is neither here nor there. It merely restates what I think everybody believed the law was beforehand, which was there has to be a subjective portion of the crime. That is, the defendant has to intend that his speech causes fear, and there has to be a perception from a reasonable person that the speech communicated, in fact, causes fear. And so in this case, the fact that the jury instruction uses the word threat means that the jury had to find that this was language that could have caused fear. There's no case right on point, is there? No, there's not, Your Honor. Although if you look at a decision in the United States v. Sutcliffe where the challenge was as to the subjective intent of the instruction, whether the instruction sufficiently instructed the jury's subjective intent, it's virtually identical to this language here, and the court had no problem with it. So I think this is a very sort of standard form of the way the juries are instructed as to what a threat is. But let me add one thing, which is this is an extortionate threat, and so there's a second element of this jury instruction because the jury had to find that the language was communicated because of fear or because of threat and use of force. And so it's actually the extortion portion of the jury instruction that tells the jury that the defendant had to intend to do something where the language was because of fear. That's what the threat was, and so it's in there in a sense two times. It's in there if you read into the word threat. It's also there because of the extortionate nature of this charge, that the defendant's conduct had to be because of fear or because of threat and use of force. So from your perspective, there'd be no way that the jury could have wrongfully convicted under that definition? No, Your Honor, not at all. And, you know, just as an aside, even if the defense counsel and the government or the defense counsel and the court both saw an instruction that was much more explicit from the government, neither of them thought there was anything wrong with taking that language out because if the jury just uses their common sense and their plain meaning of the words, they would have gotten here. And the evidence at trial, you know, the evidence at trial was more than sufficient that this was, in fact, objectively a threat. And if you read the language of the communication, you don't need to go any further. What it says is, believe me, gentlemen, I won't wait for karma to come to you. I'll be bringing it to you myself immediately. So you all better start paying attention to everything around you because hell is soon to be full in session. And so there was more than sufficient evidence from which the jury can conclude that, objectively, this was threatening speech. And there's really no other conclusion the jury could have gotten to if you just read that language. When you say threatening, you mean objectively? Correct, Your Honor. Threatening to a reasonable person. Yes, Your Honor. And they had good indicia of that. I see my time's up. But they had good indicia of that from the actual people who heard the threat, many of who felt that they had been threatened and actually sent e-mails or dealt with it on that basis. So there was lots of evidence that the jury had. Unless there's additional questions, your time is up. All right. Thank you, Your Honor. Thank you for your argument. Your Honors, I'd like to pick up on a few things mentioned by the Court and counsel. Picking up on what Judge Hugg noted, I think this case is highly unique. As Judge Hugg noted, there are no victims in this case. And, in fact, we have a fact pattern, unlike all the cases I've cited in my fact pattern, where you have highly sophisticated recipients who ultimately are either immediately rejecting Mr. Williams or, after meeting with him for a couple hours, deciding they're not going to hire him. So I think this is very unique ground. But let me turn to the extortion issue, which is I think there's several problems with this. Well, you're addressing now the jury instruction, is that right? Correct. All right. Now, what's our standard of review on that? And let me clarify the jury instruction with regard to extortion. The standard of review in this case will be argued that it's plain error. And if that's the case, I can win that argument because there's a case I cited where the court stated that they reversed a case because one of the elements was missing. Because you didn't. There wasn't an objection in the district court, right? In my case? Yes. That's correct, Your Honor. There was not. I would submit, though, that there should be a more elevated review warranted because this is pure speech. So I would ask for a higher standard of review. But let me talk about what I would have liked to have seen in the jury instruction. And, actually, this is the reverse of Cassell. In United States v. Cassell, the court instructed the jury on the object of standard, but it failed to instruct on the subject of standard, and it reversed the case and sent it back. In Cassell, I'll quote what the jury was instructed. What the statement to the jury was, was, would a reasonable person, let's see. What page are you on? You know? Well, I have, actually, let me look at, let me cite to, the jury instruction is actually at ER 34. And I've just handwritten my notes, so, Your Honor, I don't have a specific page for you. But I'm just going to quote what Cassell had read to the jury with regard to the object of standard. And, again, that wasn't the issue in Cassell, but I'm just giving an example of what should have been read to this jury. In Cassell, a portion of the opinion says, quote, A true threat involves words or conduct that would put an ordinary, reasonably prudent person in fear of apprehension. We don't have that in this instruction. If you look at ER 34, and you look, which is jury instruction 18 below, it lists the subjective aspect of it, but not the objective. So, again, we have the reverse of Cassell. In Cassell, it was reversed because it was missing the subjective. And in this case, it should be reversed because it's missing the objective. Judge Callahan. I'm sorry, Your Honor. Well, just a minute. Does Cassell hold that both are required? Well, that would take us to Bagdasarian. Actually, it really wasn't an issue because it was given to the jury. Cassell focused more on the subjectivity. But Bagdasarian, Judge Callahan asked us. Well, that's what I'm getting at. And here, wasn't there an instruction on the subjective element, I'll call it? Right, Your Honor. So it conforms to Cassell. That does. But my point is, I think one of the questions would be, well, what should have been in there? And I'm borrowing language from Cassell, but actually I could borrow it from Bagdasarian. Of course, that was a bench trial. But Bagdasarian tells us that you need both subjective and objective. So I think Bagdasarian does not help the government because it was a reversal of a bench trial. And the court said that even looking at those words, the threats, the perceived threats to President Obama, that didn't satisfy either the objective or the subjective aspect of it. In this case, I think if you look at those three sentences and take the context, which is buried in yet the third of three e-mails, buried at the tail end of it, it doesn't tell us much of anything specific. It doesn't tell us. It says that harm is going to happen. We don't know what that means. Hell is soon to follow. Not sure what that means. That sounds sort of predictive, like Bagdasarian told us. And it doesn't give us the specifics we would usually see. For example, an extortionate threat would be give me $50,000 by next Tuesday or I'm going to harm your family. We don't see that here. And in the majority in Bagdasarian, they reversed for something similar, I think, missing specifics and more predictive in nature. Bagdasarian also talked about the individual in that case seemed to be more angry and frustrated and wasn't really offering a specific threat. Essentially, it was a reflection of his anger, and at most it was maybe a prediction of something bad to happen. So, Your Honor, we think that extortion, which really drives the sentencing in this case, is wrong because of the jury instruction and the failure of objective and subjective proof. Thank you. All right. Unless there's further questions, that will conclude argument. And this matter will stand submitted and court stands in recess until tomorrow at 9. Thank you both for your argument. It was very helpful.
judges: Hug, Tashima, Callahan